**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GINA HUFF, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-4268 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| SOS CHILDREN'S VILLAGES, | ) | |
| ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Gina Huff ("Plaintiff") brings suit against Defendant SOS Children's Villages, Illinois ("Defendant" or "SOS") for violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("FMLA").[1] Currently before the Court is Defendant's motion for summary judgment, [35]. For the following reasons, the motion [35] is denied. This case is set for a telephonic status hearing on April 14, 2021 at 9:45 a.m. Participants should use the Court's toll-free, call-in number 877-336-1829, passcode is 6963747.

**I.    Background**

The following facts are taken from the parties' Local Rule 56.1 statements and supporting exhibits. See [37] through [41], [46], [47]. The facts are undisputed unless otherwise indicated. The Court has jurisdiction over this FMLA action pursuant to 28 U.S.C. §1331 and § 1343.

As a preliminary matter, the Court notes that Plaintiff's counsel filed a responsive Local Rule 56.1 statement, but no legal brief. Local Rule 56.1(b)(1) and (g) requires a party opposing summary judgment to file a memorandum of law setting forth legal argument in opposition to

---

[1] Plaintiff voluntarily dismissed her ADA claims (Counts I and II) with prejudice in December 2019. See [21].

summary judgment.  Defendant pointed out Plaintiff's failure to file a response brief on the first page of its reply brief, which was filed months ago.  See [48] at 1.  The Court therefore presumes that Plaintiff's decision to proceed without a brief was not an oversight and will decide Defendant's motion on the materials before it.

The Court has discretion to require strict compliance with the local rules, as well as to "overlook transgressions of the local rules so long as it enforces or relaxes the rules equally as between the parties."  *Jackson v. Bank of New York*, 62 F. Supp. 3d 802, 807 (N.D. Ill. 2014) (citing *Modrowski v. Pigatto,* 712 F.3d 1166, 1169 (7th Cir. 2013)); see also *Sapia v. Board of Education of the City of Chicago*, 318 F. Supp. 3d 1049, 1050 (N.D. Ill. 2018).  Here, the Court chooses not to penalize Plaintiff for failing to file a response brief, as Defendant's briefs and the parties' Local Rule 56.1 statements organize and present the facts and law in a sufficiently clear manner to allow the Court to resolve Defendant's motion on its substance, see *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015), which is typically the preferable course.  See, *e.g., Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) (noting strong federal policy "of deciding cases on the basis of the substantive rights involved rather than on technicalities"); *Hammer v. Residential Credit Solutions, Inc.*, 2015 WL 7776807, at *34 (N.D. Ill. Dec. 3, 2015) (same).  Defendant's objections to particular factual statements offered by Plaintiff are discussed where necessary in this background section of the opinion.

Defendant is a non-profit, social services organization that provides foster care services and other supportive services to "DCFS youth in care" and protects their interests and rights.  [37] at 2.  Defendant employs professional foster parents to live in single-family homes and care for sibling groups in the foster care system.  Each group of homes, or "Village", offers comprehensive

services including individual and group counseling, mentoring, and educational and cultural enrichment opportunities.

Plaintiff was employed by Defendant as its Director of Programs and Services from July 20, 2017 to August 15, 2018. Plaintiff was an at-will employee. She was responsible for, among other things, interviewing and hiring employees; ensuring that her subordinates entered notes in a proper and timely manner; approving subordinates' time off requests and overtime; ensuring that internal transfers were completed; and "insuring mistakes are not made." [46] at 2-3. Plaintiff supervised several individuals, including Valerie Jarrett, Mercedes Hunter, Cierra King, and Kenya Beasley. Terrence McNicholas ("McNicholas"), Deputy Director of Operations – Clinical Support for SOS, supervised Plaintiff until his resignation in late May 2018. On April 20, 2018, McNicholas gave Plaintiff a positive performance review. The review covered the period of April 1, 2016 through December 31, 2017. See [47] at 1. Plaintiff maintains, but Defendant disputes, that the performance review was "approved" by Defendant's Chief Executive Officer, Timothy McCormick ("McCormick").

Prior to McNicholas' resignation, Delphine Rankin ("Rankin"), the Deputy Director of Operations – Case Management Support for SOS, interacted with Plaintiff concerning "outcomes of program delivery for all sites providing foster care." [46] at 3. Rankin did not have any "direct supervisory authority over Plaintiff," but (according to Defendant) Rankin had "full oversight over all staff in the foster care system at Defendant, which included Plaintiff and her team." [47] at 2. In June 2018, Rankin became Plaintiff's direct supervisor. See [46] at 3. Around June 7, 2018, Rankin had a telephonic meeting with Plaintiff to discuss Plaintiff's role with SOS and Rankin's expectations for Plaintiff going forward. "Plaintiff agreed that if Rankin provided her a directive during her supervision conversation regarding Rankin's expectations for her going forward, and

Plaintiff was not able to meet those expectations and deadlines, it was not okay to not keep Rankin informed." *Id*. at 3-4.

According to Plaintiff, she has a medical history of migraines and was, during all relevant times, under the care of a doctor for this condition. However, Plaintiff began having more severe migraines in January 2018. Depending on the severity, these migraines caused Plaintiff pain, nausea, and dizziness and affected her ability to concentrate, tolerate light, walk, and drive. See [47] at 5-6.[2] According to Plaintiff's affidavit, McNicholas and Rankin both have been aware since at least January 2018 that she suffers from migraines. See [47] at 6.[3] By August 2018, Plaintiff's migraines had become intolerable so her doctor switched her medications. *Id*.

According to Defendant, when Rankin took over as Plaintiff's supervisor in June 2018, she "frequently found [Plaintiff's] performance inadequate." [46] at 4. Plaintiff denies having any knowledge of Rankin's dissatisfaction with her performance until July 13, 2018, because "Rankin had not communicated any alleged dissatisfaction to Plaintiff." *Id*. Defendant maintains that "Plaintiff had an ongoing failure to properly document—and to ensure her direct reports document—visits to children, parents, and foster parents despite multiple directives from Rankin."

---

[2] Defendant moves to strike Plaintiff's statements concerning her medical condition on the basis that they are not relevant to resolving Defendant's motion for summary judgment. However, one of the elements of a claim for FMLA interference is that the plaintiff is eligible for FMLA protection, which requires a showing that "(1) she is afflicted with a 'serious health condition,' and (2) that condition makes her unable to perform the essential functions of her position." *Valdivia v. Township High School*, 942 F.3d 395, 398 (7th Cir. 2019) (quoting *Guzman v. Brown Cnty.*, 884 F.3d 633, 638 (7th Cir. 2018)). Although Defendant does not dispute that Plaintiff can satisfy this requirement, the background facts concerning Plaintiff's medical condition are relevant regardless and necessary for a full understanding of this case.

[3] Defendant objects to this statement on the basis of relevance and because it is conclusory, *i.e.* it "lacks dates, names, etc. of the circumstances in which these individuals were made aware of the alleged migraines." [47] at 6. The statement is relevant, however, because liability hinges in part on Defendant knowing that Plaintiff suffered from a serious medical condition. See, *e.g.*, *Ennin v. CNH Industrial America, LLC*, 878 F.3d 590, 597 (7th Cir. 2017). Plaintiff's statement is somewhat conclusory, but Defendant does not counter it with any record materials of its own, which presumably it could have done if Plaintiff's statement was incorrect. While this particular fact has little bearing on the Court's decision, the Court will not strike it as Defendant requests.

4

*Id*. at 4-5.  Defendant provides a number of examples, about half from January 2018 (before Rankin was Plaintiff's direct supervisor) and half from late June to early July 2018.  As to the earlier period, Plaintiff states that although, "[t]ypically, paperwork should be sent to DCFS within 48 hours," "as a matter of practice, if the (non-emergen[cy]) paperwork was sent by the 15th of the following month, DCFS accepted the submissions."  *Id.* at 5.  According to Plaintiff, her then-supervisor McNicholas recognized that everyone was overworked so he "directed Plaintiff to give everyone a 'clean slate' and to work with them on documentation issues" and "[t]hereafter, everyone got on track with their documentation."  *Id*.  The June-July 2018 examples all concern home visits that Plaintiff conducted on June 7 and 13, 2018.  According to Defendant, "Plaintiff failed to enter notes into the system per SOS policy," and Rankin had to email Plaintiff three times (on June 26, July 2, and July 5, 2018) to enter the notes.  Plaintiff maintains that as Director of Programs and Services, she did not typically conduct home visits but volunteered to do the June 7 and 13 visits to help alleviate others' workload.  Plaintiff maintains that "[a]fter her visits, [she] gave her notes to one of her reports, Cierra, to be placed into the SACWIS system."  *Id*. at 5.  "Cierra was aware that the notes needed to be input and she did so prior to the DCFS deadline."  *Id*.  Defendant further maintains that Plaintiff had "an ongoing failure to respond to basic requests from Rankin and complete components of her job" and provides a long list of examples where Rankin emailed Plaintiff to request information that (in Rankin's view) should have been provided already or to complete tasks that should have been completed already.  [46] at 6.  For the most part, Plaintiff disputes these criticisms of her job performance.

Rankin issued two Employee Warning Notices to Plaintiff on July 13, 2018.  Plaintiff had never been disciplined prior to receiving these two warnings.  See [47] at 3.  The first warning stated that Plaintiff failed to follow appropriate procedures for responding to a hotline call

regarding a minor in foster care, which Plaintiff denies. See [46] at 11. The second warning provided that "Plaintiff failed to complete the internal planned transfer procedure to adequately prepare for the transition of a separating employee." *Id*. Plaintiff disputes that this warning was warranted, either. *Id.* at 12. Plaintiff refused to sign either warning notice. On July 16, 2018, she filed rebuttals and grievances against Rankin and Nichole Robinson-Anyaso ("Robinson-Anyaso"), Defendant's former Director of Licensing and Talent Management, who worked in Defendant's human resources ("HR") department. Plaintiff stated that Robinson-Anyaso and Rankin had "intentionally create[ed] a hostile work environment with behaviors designed to target [Plaintiff] and 'apply pressure' to force her resignation." *Id*. Plaintiff asked that her grievance be heard by someone other than Robinson-Anyaso due to her close personal friendship with Rankin.[4] Plaintiff also requested to be assigned to a new supervisor.

Defendant maintains, based on an affidavit from CEO McCormick, that in connection with the warning notices, a "performance improvement plan ('PIP') would [need] to be developed within five (5) days to address areas of concern." [46] at 13. Plaintiff denies that there was a specific time in which a PIP had to be prepared. See *id*.; see also [47] at 5. Regardless, it is undisputed that the purpose of the PIP process is "to establish specific, measurable goals for improvement to be achieved with a certain time period, usually at least thirty (30) days depending on the identified goals." *Id.* at 3-4. Plaintiff, as Director of Program and Services, supervised a number of employees herself and was able to make hiring and firing recommendations to HR and McCormick. Plaintiff states that in late September 2017, she issued a PIP to one of her reports.

---

[4] According to Plaintiff, Rankin and Robinson-Anyaso were sorority sisters and are close friends. Defendant moves to strike this statement on relevance grounds. See [47] at 8. The Court declines to do so, although its opinion does not rely on this particular fact.

After the employee failed to improve her performance, Plaintiff recommended her termination and the employee was terminated in December 2017. See *id.* at 3.[5]

McCormick contacted HR Source on July 20, 2018, in search of a neutral third party to investigate (according to Defendant) or mediate (according to Plaintiff) Plaintiff's grievances. See [46] at 14. On July 25, 2018, Angela Adams, Director of HR Source, interviewed Plaintiff, Rankin, and Robinson-Anyaso in connection with the two warnings and Plaintiff's related grievances. On July 31, 2018, Adams issued a written report concluding that Plaintiff's grievances were without merit and that the warnings given to Plaintiff were appropriate. Based on this report, McCormick denied Plaintiff's request for a new supervisor.

On August 6, 2018, McCormick held a meeting with Plaintiff, Rankin, and Robinson-Anyaso to discuss possible solutions to what appeared to be a personal conflict and breakdown in communication. According to Plaintiff, McCormick "stated he wanted everyone to move forward 'in a very collegial spirit'" and Plaintiff agreed. [46] at 14. McCormick followed up with an email that concluded, "I trust that we can all work together to seek a satisfactory resolution to these important issues. Much appreciation to everyone to committing to make this work in the best interests of the children and families we serve." *Id*. at 14-15. During the meeting, Plaintiff and Rankin agreed to begin meeting one-on-one each week to facilitate better communication. Rankin and Plaintiff also agreed to exchange lists of actions they would take to improve their professional dynamic.

---

[5] Defendant objects to Plaintiff's statements of fact concerning her understanding of and experience with PIPs on the basis they are not relevant to the Court's determination of the motion for summary judgment; Defendant does not provide a substantive response to the statements. See [47] at 3, ¶¶ 6-7. The Court concludes that the statements are relevant to the issue of whether Defendant has a policy or practice to give employees a certain amount of time after issuing a PIP to improve their performance before any termination decision is made. Plaintiff's position is that it was out of the norm for Defendant to fire her only days after giving her a PIP, and (in her version of the facts) immediately after she informed Defendant of her serious medical condition and need for FMLA leave.

On August 7, 2018, Plaintiff sent Rankin her promised list of actions to improve their professional dynamic, including: (1) direct communication; (2) truthful communication; (3) respectful communication.  On the same day, Rankin sent Plaintiff her promised list of actions to improve their professional dynamic, including: "(1) holding weekly meetings with her with a fixed agenda; (2) attending monthly meeting and to be sure to promote the positive at the Village; and (3) serving as a conduit with other departments to ensure program enhancements and efficiencies." [46] at 15.  According to Defendant, "Rankin found Plaintiff's three actions as being non-responsive to the task at hand and unhelpful in improving the professional dynamic between Plaintiff and Rankin" and "asked Plaintiff to send three specific actions she would be taking at that time that would benefit the issues addressed the previous day and create a pathway for a stronger and more supportive working relationship between the both of them." [46] at 15.  Plaintiff disputes that her list of actions was nonresponsive but "agreed to provide more specific examples at their previously scheduled meeting on August 8, 2018."  *Id*. at 15-16.

On August 8, 2018 at around 1:00 p.m., Rankin met with Plaintiff to discuss their communication challenges.  See [47] at 6.  According to Defendant, the purpose of this meeting was also to issue Plaintiff a PIP in connection with the warning notices; however, Plaintiff denies that a PIP had ever been discussed and asserts that instead "the plan on August 6, 2018 was to move forward together for the greater good." [46] at 16.  Plaintiff refused to sign the PIP because she believed it listed issues that did not require improvement and that she and Rankin never discussed and was "just completely inaccurate."  *Id*.  Plaintiff acknowledges, however, that there were issues she "could improve upon," including missed deadlines.  *Id*. at 17.  In Defendant's view, Plaintiff "refused to accept responsibility for the Employee Warning Notices, despite the

fact that her related Grievances had been resolved against her, after a neutral, third party investigation." [47] at 4.

It is undisputed that "there is no requirement that an employee sign off on his/her discipline or PIP." [47] at 4. It is also undisputed that "[a]s a supervisor, Plaintiff was never informed of a policy or practice at SOS which prohibited an employee from questioning a supervisor about disciplinary matters pertaining to that employee." *Id.* at 5. Further, it is undisputed that "an employee is not subordinate when disagreeing with a supervisor or filing a grievance" and that "the Personnel Employee Manual provides that an employee may grieve their discipline." *Id*

According to Plaintiff, by the time she returned to her office after meeting with Rankin, she was feeling sick with a migraine. Plaintiff states in an affidavit that she reported to Rankin that she would have to leave work a bit early; Rankin denies in her own supplemental affidavit that Plaintiff left early on the 8th or "that Plaintiff contacted Rankin regarding the same." [47] at 6-7. On August 9, 2018, Plaintiff returned to work, but by early afternoon her migraine again worsened and she needed to leave. Plaintiff contacted her supervisor, as required by Defendant's policy. See *id.* at 7.

According to their affidavits, Robinson-Anyaso and Rankin spoke by telephone on August 9, 2018 about the outcome of the previous day's meeting between Rankin and Plaintiff. (Plaintiff states that she can neither admit nor deny the contents of the alleged conversation, to which she was not privy. See [46] at 17-18.) Robinson-Anyaso and Rankin state that they "discussed Plaintiff's record of poor performance, despite a series of efforts by Rankin to counsel Plaintiff via email, in-person, and over the telephone." *Id.* at 17. They also "discussed her poor attitude and, specifically, unprofessional response to the resolution of her Grievances and to the issuance of a PIP." *Id.* at 17-18. "Based on Plaintiff's unwillingness to perform her critical role at SOS and

unlikeliness to improve, Rankin and Robinson-Anyaso decided it was in SOS's interest to terminate Plaintiff's employment." *Id*. at 18. Plaintiff states that she "was never unwilling to perform her job at SOS and was open to improvement," but "was never given the opportunity to improve upon anything because she was never allowed to come back to work." *Id*. According to Defendants' affidavits, "Robinson-Anyaso requested that Rankin gather and provide her documentation relating to Plaintiff's performance issues to support their recommendation of termination to McCormick." *Id*. at 19.

The same day Robinson-Anyaso and Rankin spoke, August 9, 2018, Plaintiff sent Rankin an email telling Rankin that she needed to leave early due to a migraine headache, which was making her nauseous. She stated that she was going to attempt to get a doctor's appointment and told Rankin about a few items that would require attention while she was away.

Plaintiff called in sick on August 10, 2018 (a Friday) and spoke with Robinson-Anyaso in HR. The parties dispute what was said on that phone call. According to Plaintiff, she called Robinson-Anyaso "because they needed the doctor's statement on that very same day." [46] at 21. Plaintiff states that Robinson-Anyaso asked her if she was requesting FMLA leave and Plaintiff answered "yes, I am requesting FMLA. Can you forward me the paperwork for it?" *Id*. Robinson-Anyaso allegedly responded "yeah, it will take a couple of days, I'll e-mail it to you." *Id*. Plaintiff also asserts that she read Robinson-Anyaso the note from her doctor at Northwestern Medicine, which stated: "Gina has been evaluated by me today. Due to headache syndrome, she will need to rest by lying down in a darkened and quiet room. This may necessitate that she leave work for the day up to twice per week. She may return to work when her symptoms are improved without any restrictions. Please fax me any needed paperwork you require." [47] at 7. Defendant admits that Plaintiff "called Robinson-Anyaso to inform her that she would be faxing her a note,"

10

but maintains that Plaintiff "did not indicate during that conversation that she suffered from 'migraines' or 'headache syndrome,' and/or that she was requesting intermittent leave pursuant to the Family Medical Leave Act" and "did not read" the doctor's note. *Id*.

Plaintiff called in sick on August 13, 2018, a Monday. Defendant contends that on that day and the previous Friday "Plaintiff missed scheduled interviews with prospective employees, failed to notify individuals (including interviewees) regarding her absence and failed to reschedule interviews with said prospective employees." [46] at 19. Plaintiff denies this. She points out that Rankin had access to her calendar and was responsible for checking it if Plaintiff was out sick and states that she informed Rankin of every interview or appointment of which she was aware. See [46] at 11. Defendant disputes this and states that "[w]hen an employee is out sick, it is the practice of Defendant to require that the employee to reach out to their supervisor to inform his/her supervisor that he/she was out sick and that he/she had appointments that would need to be rescheduled" and "[t]he employee would need to identify the appointments that would need to be rescheduled." [47] at 11-12. It is undisputed, however, that a sick employee is not required to perform work, even if her supervisor must fill in.

The same Monday that Plaintiff called in sick, Robinson-Anyaso, with the requested documentation she received from Rankin, "presented the recommendation to McCormick to terminate Plaintiff." [46] at 19. Robinson-Anyaso also emailed McCormick a work performance synopsis for Plaintiff. McCormick agreed with the recommendation and instructed Robinson-Anyaso to contact SOS's pro bono counsel, Laurie Holmes, to discuss the details of the termination.

On August 14, 2018, at 9:13 a.m., Defendant received a fax from Plaintiff, which stated: "Nichole, I am currently out sick, please follow-up with my physician." [46] at 20. The fax

contained a copy of the doctor's note quoted above. See [39] at 112. According to Defendant, "McCormick was not aware of the August 14, 2018 Fax, and related request for accommodation, when he approved the recommendation to terminate Plaintiff's employment." [46] at 22. Plaintiff states that she can neither admit nor deny this, but states that "Robinson-Anyaso had been made aware of the FMLA request on August 10, 2018 and most likely discussed it with Rankin." [46] at 21.[6]

On August 15, 2018, Robinson-Anyaso called Plaintiff to inform her that her employment was terminated. [39] at 21. Plaintiff testified at her deposition that she did not "have a belief as to why [she] was terminated," but disputes this in her Local Rule 56.1 statement, explaining: "As evidenced by the instant suit, Plaintiff clearly believes she was terminated as a result of her FMLA request. Plaintiff reasonably believed that defense counsel was asking her if Defendant gave her any reason for the termination." *Id*. Defendant claims, and Plaintiff disputes, that "[n]either the doctor's note, nor Plaintiff's request for intermittent leave within the doctor's note, nor any other protected activity or characteristic had any bearing on SOS's decision to terminate Plaintiff," but "[r]ather, the decision was based entirely on Plaintiff's unacceptable job performance and poor attitude." *Id*. at 22.

It is undisputed that "SOS has a policy and business practice of applying progressive discipline to employees experiencing performance issues." [46] at 22. "When it is apparent that an employee will never meet SOS's legitimate business expectations in their job performance, SOS terminates that employee." *Id*. at 23. According to affidavits provided by McCormick, Rankin, and Robinson-Anyaso, this policy and business practice includes "disciplining employees with poor attitudes, or who engage in insubordination." *Id*. at 22.

---

[6] Defendant objects to Plaintiff's inference about what Rankin "likely" knew as speculative; the Court need not resolve this dispute to determine the motion, as noted in the analysis below.

Plaintiff denies that she had a poor attitude or was insubordinate and also denies that Defendant applies its policies or practices "uniformly, without regard for protected classifications and/or statutorily protected activity." [46] at 23. Plaintiff further denies that Defendant had cause for terminating her, explaining "that SOS could not have reasonably concluded that Plaintiff would never meet SOS's legitimate business expectations" because "Plaintiff worked for over a year and received an exceptional performance evaluation"; "Defendant experienced significant growth under Plaintiff's leadership," including doubling the numbers of Chicago Village parents and children; and "there were a number of other measurable improvements including the number of children receiving specialized services and care." *Id*.

Based on these facts, Plaintiff brings a single count for violation of the FMLA. Plaintiff alleges that "[o]n or about August 12, 2018," she "requested from Defendant's Human Resources intermittent or reduced schedule leave" to address her chronic serious health condition, which made her unable to perform the functions of her job. [1] at 5. Plaintiff alleges that "Human Resources confirmed that Plaintiff was requesting FMLA and told Plaintiff that it would forward her the necessary paperwork within the next few days" but "never forwarded the paperwork as promised and on August 15, 2018, [Defendant] fired Plaintiff from her job without lawful justification, without warning, and in contravention of SOS's progressive disciplinary plan." *Id*. Plaintiff alleges that Defendant violated her rights under the FMLA "because it terminated [her] employment because of [her] request" for intermittent leave. *Id*. Plaintiff seeks damages, equitable relief, and attorneys' fees and costs. See *id*. at 6.

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party."  *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).  It "'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'"  *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Liberty Lobby*, 477 U.S. at 252.

14

### III.    Analysis

The complaint's single count for violation of the FMLA does not specify whether Plaintiff is suing for FMLA interference, FMLA retaliation, or both.    Since Plaintiff did not file a memorandum of law tying her version of the facts to the law, the Court does not have the benefit of Plaintiff's counsel's view of the application of the law to the facts of this case.    Nonetheless, Defendant assumes, and the Court will also assume here, that Plaintiff intended to bring both types of FMLA claims.

#### A.    FMLA Retaliation

"Retaliation claims under the FMLA require that: (1) the employee engaged in statutorily protected activity; (2) the employer subjected her to an adverse action; and (3) the protected activity caused the adverse action." *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018) (citing *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018)).    Here, Defendant "does not dispute that Plaintiff engaged in a statutorily protected activity by requesting intermittent leave pursuant to the FMLA" or that Plaintiff "suffered an adverse employment action" by being terminated.    [36] at 10.    Defendant "does dispute, however, that there is a causal connection between the protected activity and the subsequent termination." *Id*.

According to Defendant, its "decision to terminate Plaintiff's employment occurred prior to Plaintiff requesting leave pursuant to the FMLA." [36] at 10.    In particular, Defendant contends that the decision to terminate Plaintiff was made on August 9, 2018—when Rankin and Robinson-Anyaso allegedly agreed over the phone to recommend Plaintiff's termination—and that Plaintiff did not communicate her request for leave to Defendant until August 14, 2018, when Plaintiff faxed her doctor's note to Robinson-Anyaso.    Defendant argues further that "[e]ven if the decision to terminate Plaintiff's employment had not occurred prior to her request for intermittent leave,"

15

"suspicious timing by itself is rarely enough to overcome summary judgment." *Id*. According to Defendant, "the record is devoid of any evidence that SOS made any direct statements to Plaintiff on or near the date of her termination that the reason it was terminating her employment was in response to and/or in retaliation against her request for intermittent leave under the FMLA." *Id.* at 11. Defendant further contends that Plaintiff cannot show that she was meeting its legitimate business expectations at the time she was terminated or that she was treated less favorably than similarly situated employees who did not engage in protected activity. See *id*. at 11-14.

To avoid summary judgment, Plaintiff "need not prove that retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Lewis v. School Dist. #70*, 523 F.3d 730, 741-42 (7th Cir. 2008) (quoting *Culver v. Gorman & Co.,* 416 F.3d 540, 545 (7th Cir. 2005)). "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Id*.; see also *Goelzer v. Sheboygan County*, 604 F.3d 987, 995 (7th Cir. 2010); *Haworth v. Round Lake Area Schools*, 2019 WL 3080928, at *5 & n.2 (N.D. Ill. July 25, 2019); *Hobbs v. Sloan Valve Co*., 2015 WL 4231743, at *11 (N.D. Ill. July 10, 2015); *Searle v. Salvation Army*, 2019 WL 952710, at *9 (S.D. Ind. Feb. 27, 2019); Seventh Circuit Pattern Civil Jury Instructions, Instruction 10.4, Elements of FMLA Retaliation Claim & comment C.

Plaintiff "can avert summary judgment on an FMLA retaliation claim ... by proffering [either] direct or circumstantial evidence of her employer's discriminatory motivation." *Lewis*, 523 F.3d at 741; see also *Haworth*, 2019 WL 3080928, at *5. "As under Title VII, 'the appropriate question on summary judgment is simply: could a reasonable jury find based on *all* available evidence that a ... retaliatory motive caused [plaintiff's] termination?'" *Id*. (quoting *Grant v. Trs.*

*of Ind. Univ.*, 870 F.3d 562, 569 (7th Cir. 2017)). "[W]e consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation." *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016)); see also *Ortiz*, 834 F.3d at 765 ("we hold that district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards").

The Seventh Circuit has "repeatedly held that '[s]uspicious timing alone rarely is sufficient to create a triable issue,' and on a motion for summary judgment, 'mere temporal proximity is not enough to establish a genuine issue of material fact.'" *Riley*, 909 F.3d at 188 (quoting *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009)). "Rather, a 'plaintiff must ordinarily present other evidence that the employer's explanation'" for the adverse employment action "'was pretext for retaliation.'" *Id.* at 188-89 (quoting *Tibbs v. Admin. Office of the Ill. Cts.*, 860 F.3d 502, 505 (7th Cir. 2017)). "'Summary judgment for the employer is proper where the employer provides undisputed evidence that the adverse employment action is based upon the employee's poor job performance.'" *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 369 (7th Cir. 2020) (quoting *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 221 (7th Cir. 2015)). Summary judgment will be denied if the plaintiff is able to "point to 'evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate' the termination." *Tibbs*, 860 F.3d at 506 (quoting *Carter v. Chicago State Univ.*, 778 F.3d 651, 659 (7th Cir. 2015)).

After reviewing Defendants' briefs, the parties' Local Rule 56.1 statements, and the summary judgment record, the Court concludes that Defendant is not entitled to summary judgment because there are disputed material questions of fact concerning: (1) whether Defendant terminated Plaintiff before Plaintiff requested FMLA leave; and (2) whether Plaintiff's termination

was based upon her poor job performance or, rather, was motivated by her exercise of rights protected by the FMLA.

As to the timing issue, a reasonable factfinder could conclude that Plaintiff requested FMLA leave either on August 10, 2018—when Plaintiff claims to have read Robinson-Anyaso her doctor's note over the phone and specifically invoked FMLA—or August 14, 2018—when Plaintiff faxed her doctor's note to Robinson-Anyaso. The Court cannot pick one date over the other without assessing the parties' credibility, which is not a task for summary judgment. See *Johnson*, 936 F.3d at 705. A reasonable factfinder also could conclude that Defendant's decision to terminate Plaintiff was made as early as August 9, 2018—when Rankin and Robinson-Anyaso spoke on the phone—or as late as August 15, 2018—when Defendant told Plaintiff that she was terminated.

There are a number of material factual disputes tied up with determining when, precisely, Defendant "decided" to terminate Plaintiff. Summary judgment is appropriate only when it is undisputed that the decision to terminate was made prior to the plaintiff requesting FMLA leave. Compare, e.g., *Riley*, 909 F.3d at 188 (city housing authority entitled to summary judgment on FMLA interference and retaliation claim where undisputed record showed decision to terminate employee was made prior to employee's request for FMLA); *Ennin v. CNH Industrial America, LLC*, 878 F.3d 590, 597 (7th Cir. 2017) (where it was undisputed that employer terminated employee before he became disabled and before it knew that he had requested FMLA leave, employer could not have fired him because of his disability or his decision to take FMLA leave, precluding employee's FMLA retaliation claim).

Defendant maintains that the decision to terminate Plaintiff was complete on August 9, 2018, when Rankin and Robinson-Anyaso claim to have gone over what occurred during the

previous day's meeting between Rankin and Plaintiff and determined that Plaintiff's performance was unlikely to improve and termination was warranted. Defendant presumes that the factfinder has to take Rankin and Robinson-Anyaso at their word about when, exactly, they decided Plaintiff should be terminated, since Plaintiff does not have any evidence to the contrary, not being a participant on that phone call. However, "'[w]hen the testimony of a witness is not believed, the trier of fact may simply disregard it.'" *Lapre v. City of Chicago*, 911 F.3d 424, 436 (7th Cir. 2018) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984)). "Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *Id*. But it is unnecessary to do that here to conclude that the date Defendant made its decision to terminate Plaintiff might have been later than August 9, 2018; there is other evidence in the record supporting Plaintiff's position that the decision to terminate her was made only after she requested FMLA leave.

Rankin and Robinson-Anyaso did not make their recommendation until August 13, 2018, which was after the date (August 10) Plaintiff claims to have read her doctor's note to Robinson-Anyaso and requested FMLA leave. When they gathered supporting materials to present to McCormick with their recommendation, Rankin and Robinson-Anyaso included events that happened on the same date and after Plaintiff allegedly requested FMLA leave. See, e.g., [39] at 106 (8/13/18 3:04 p.m. email from Kelsey Balk to Delphine Rankin with "notes about the recent missed/rescheduled interviews from the past week," including 8/10 and 8/13, as well as 8/8 and 8/9 on which Plaintiff alleges she told Defendant she was sick); [39] at 109 (8/13/18 3:10 p.m. email from Rankin to McCormick and Robinson-Anyaso, last paragraph: "The Director of Recruitment has scheduled multiple interviews for various positions under Ms. Huff's leadership and due to lack of confirmation of scheduled interview and/or failure to appear, interviews have

been rescheduled or other staff have assumed this responsibility. Since August 8, Miss Huff has missed one interview and five have been rescheduled and or other staff have assumed responsibility."). Viewing the record in the light most favorable to Plaintiff, Robinson-Anyaso knew that Plaintiff had requested FMLA leave for the 10th and 13th, and was also out on the 8th and 9th due to illness, yet used Plaintiff's absences to justify her recommendation to terminate Plaintiff. Defendant does the same in its Local Rule 56.1 statement. Among the examples provided for Plaintiff's alleged "ongoing failure to respond to basic requests from Rankin and complete components of her job," Defendant includes Plaintiff's absences on the 10th and 13th, as well as the two prior days on which Plaintiff also alleges to have been out due to migraines. Defendant faults Plaintiff for missing interviews, but it is disputed whether this required Rankin to take responsibility for checking Plaintiff's calendar when she was sick, see [46] at 10-11, and undisputed that employees are not required to work while they are sick, see [47] at 11-12.

More fundamentally, Rankin's and Robinson-Anyaso's alleged decision on August 9, 2018 is not dispositive of when the decision to terminate Plaintiff was made, because Defendant has not demonstrated as a matter of law that Rankin and Robinson-Anyaso are the relevant decisionmakers for purposes of determining FMLA liability. Rankin and Robinson-Anyaso merely *recommended* to McCormick that Plaintiff should be terminated. The ultimate decision, all parties appear to agree, rested with McCormick. Defendant avers that McCormick did not know of Plaintiff's request for FMLA leave at the time he made the decision to terminate Plaintiff. But "courts have imputed the retaliatory intent of a subordinate to an employer in situations where the subordinate exerts significant influence over the employment decision." *Long v. Teachers' Retirement System of Illinois*, 585 F.3d 344, 351 (7th Cir. 2009). "This theory of liability, known as the 'cat's paw' doctrine, has received inconsistent treatment in this Circuit"; some "cases hold that a subordinate

must have a singular influence over the employment decision," while "others do not draw such a bright line," focusing instead on "the lack of independent deliberation by the decision-mak[er]." *Id*. "The classic cat's paw case occurs when an 'unwitting manager or supervisor ... is persuaded to act based on another's illegal bias.'" *Morris v. BNSF Railway Co.*, 969 F.3d 753, 762–63 (7th Cir. 2020) (quoting *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011))). Neither party has discussed the cat's paw theory of liability or how it might apply in this case. Regardless, there are disputed questions of fact that prevent the Court from concluding as a matter of law that Defendant made its decision to terminate Plaintiff before Plaintiff requested FMLA leave.

Assuming Defendant decided to terminate Plaintiff only after Plaintiff requested FMLA leave, Plaintiff still must come forward with sufficient evidence that a retaliatory motive was a substantial or motivating factor in Defendant's decision to terminate her. The extremely close timing here is certainly suspicious, although that is rarely enough, standing alone, to avoid summary judgment. See *Riley*, 909 F.3d at 188. Taking Plaintiff's version of her August 10 phone call with Robinson-Anyaso as true, at least Robinson-Anyaso knew before she and Rankin recommended termination to McCormick that Plaintiff had migraines that required her to take time off work and was requesting FMLA leave. Nonetheless, they used Plaintiff's failure to attend meetings on August 10 and August 14 (as well as meetings she missed due to the same illness for which she was requesting FMLA leave) as a reason for recommending Plaintiff's termination. And they failed to tell McCormick about the FMLA request. A reasonable factfinder might see this as a deliberate attempt to paint Plaintiff in a bad light and get her fired. It is not apparent that McCormick would have agreed to termination but for the missed meetings. McCormick had met with Plaintiff, Rankin, and Robinson-Anyaso just a few days prior, on August 6, 2018, to discuss

their breakdown in communication. According to Plaintiff, the parties agreed at the meeting that they would move forward 'in a very collegial spirit.'" [46] at 14.

From McCormick's comments and his affidavit, there is no indication that Plaintiff was on the verge of termination on August 6. She had never received any discipline before the two warnings Rankin gave her in July. What happened after that date that justified terminating Plaintiff immediately, without following the standard practice of providing an employee at least thirty days under the PIP to improve? See [47] at 3-4. Plaintiff met with Rankin on August 8 and refused to sign her PIP. It is not apparent from the record that her conduct constituted a terminable offense, either immediately or after thirty days. Instead, it is undisputed that "there is no requirement that an employee sign off on his/her discipline or PIP," [47] at 4; that "an employee is not subordinate when disagreeing with a supervisor or filing a grievance"; and that "the Personnel Employee Manual provides that an employee may grieve their discipline." *Id*. at 5. Other than the August 8 meeting, the only significant occurrence between the group meeting with McCormick and the decision to terminate Plaintiff was Plaintiff taking time off to recover from her migraines and her related request to take FMLA leave. Plaintiff was terminated before she ever returned from taking off sick time.

These facts, taken together and viewed in the light most favorable to Plaintiff, could support an inference that Robinson-Anyaso (and perhaps Rankin as well) did not have sufficient justification to recommend terminating Plaintiff (at least not without giving her time to perform under the PIP), but nonetheless recommended immediate termination to McCormick in retaliation for Plaintiff requesting FMLA leave. Rankin and Robinson-Anyaso bolstered their recommendation by emphasizing the meetings Plaintiff missed on days when she required leave, without giving McCormick the full story: that Plaintiff missed work because was suffering from

severe migraines, she had seen a doctor, and she was requesting FMLA leave to deal with her condition. There is no indication from the record that McCormick "conducted an independent investigation" or relied on any sources of information other than Rankin and Robinson-Anyaso. *Long*, 585 F.3d at 351. Thus, to the extent that a factfinder believed Robinson-Anyaso or Rankin held any retaliatory intent, a factfinder could impute that intent to McCormick under the cat's pay doctrine. See *Long*, 585 F.3d at 351-52; see also *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019).

For these reasons, the Court concludes that Defendant is not entitled to summary judgment on Plaintiff' FMLA retaliation claim.

### B. FMLA Interference

"To establish FMLA interference, an employee must prove that: (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied FMLA benefits to which she was entitled." *Riley*, 909 F.3d at 188 (citing *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 761 (7th Cir. 2008)). Defendant "does not dispute that Plaintiff can establish the first, second, third, or fourth element," but does "does dispute that she can establish the fifth element," because Defendant's "decision to terminate Plaintiff's employment occurred prior to Plaintiff requesting leave pursuant to the FMLA." [36] at 15. For the reasons explained in the preceding section, the Court cannot determine as a matter of law based on the record before it that Defendant decided to terminate Plaintiff before Plaintiff requested FMLA leave. Therefore, Defendant's motion to dismiss the FMLA interference claim is also denied.

**IV.    Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment [35] is denied.  This case is set for a telephonic status hearing on April 14, 2021 at 9:45 a.m.  Participants should use the Court's toll-free, call-in number 877-336-1829, passcode is 6963747.


Dated: March 29, 2020

_____
Robert M. Dow, Jr.
United States District Judge